## CLEVELAND, COLUMBUS, &c., RAILROAD v. McCLUNG.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF OHIO.

Argued November 12, 1886. — Decided December 13, 1886.

A suit against a collector of the customs in a State court, in which the declaration alleges that the collector by his deputy delivered imported goods upon which there was a lien for freight to the consignee on receipt of the freight charges, without notifying the carrier as required by the act of June 10, 1880, § 10, 21 Stat. 175, and which seeks to recover the money so received, is removable into the Circuit Court of the United States under Rev. Stat. § 643, although the collector may allege in his defence that the act charged was not done.

A collector of customs is not authorized by the provisions of the act of June 10, 1880, c. 202, 21 Stat. 173, to collect the freight upon the transported goods, or to receive it for the lien-holder; and if a deputy collector, who acts as cashier of the collector, does so collect or receive the freight, his act is an unofficial act which entails no official responsibility upon the collector, his superior.

The following is the case as stated by the court.

The case presents the following facts: D. W. McClung held the office of collector of customs and surveyor of the port of the city of Cincinnati, under the laws of the United States, and J. L. Wartman was employed by him, with the approval of the Secretary of the Treasury, as deputy collector of customs. As such deputy Wartman acted as the cashier of the collector. Section 10 of the act of June 10, 1880, c. 190, 21 Stat. 175, is as follows:

". . . That whenever the proper officer of the customs shall be duly notified in writing of the existence of a lien for freight upon imported goods, wares, or merchandise in his custody, he shall, before delivering such . . . merchandise to the importer, owner, or consignee thereof, give reasonable notice to the party or parties claiming the lien; and the possession by the officers of customs shall not affect the dis-

charge of such lien, under such regulations as the Secretary of the Treasury may prescribe; and such officer may refuse the delivery of such merchandise from any public or bonded warehouse or other place in which the same shall be deposited, until proof to his satisfaction shall be produced that the freight thereon has been paid or secured; but the rights of the United States shall not be prejudiced thereby, nor shall the United States or its officers be in any manner liable for losses consequent upon such refusal to deliver. If merchandise so subject to a lien, regarding which notice has been filed, shall be forfeited to the United States and sold, the freight due thereon shall be paid from the proceeds of such sale in the same manner as other charges and expenses authorized by law to be paid therefrom are paid." This is part of "an act to amend the statutes in relation to immediate transportation of dutiable goods."

The Cleveland, Columbus, Cincinnati and Indianapolis Railroad Company was a common carrier, and as such designated by the Secretary of the Treasury for the purpose of receiving and transporting dutiable goods from the port of arrival to the port of destination under this act of Congress. As such carrier, so designated, this company carried to Cincinnati large quantities of dutiable goods, the freight and charges upon which amounted in the aggregate to $8477.50, and placed them in the custody and control of McClung as collector of customs and surveyor of the port, and, as is claimed, notified him in writing of its lien as carrier for such freight and charges. Wartman, as deputy collector, had charge, under McClung, of the collection of customs payable at the port of Cincinnati; and of the delivery of imported merchandise to the consignees thereof. He received the freight and charges due the company from the consignees of these goods at the same time that he received the duties, and delivered the goods to the consignees without notifying the company. The charges were never paid by him either to the company or to McClung.

Such being the conceded facts, this suit was brought against McClung in the Superior Court of Cincinnati. In the petition it is averred that McClung was collector, &c.; that the rail-

road company had carried and delivered the goods to him under the act, charged with a lien thereon for freight, of which due notice was given to him in writing, as provided in the act; and "that it became and was the duty of the defendant, as such officer, to refuse to deliver the said goods and merchandise until such freight thereon had been paid to the common carrier." It is then averred that the consignees paid the charges due the company to the defendant, "and the defendant then and there received" the same "for the account and benefit of the said . . . company, and the defendant then and thereupon caused the said goods and merchandise to be delivered to the consignees, . . . without notice to the railroad company, whereby its lien for said freight was lost;" and that "the defendant, though often requested, has not paid said" money to the plaintiff, but the same, "with interest from September 8th, 1881, is now due and unpaid from the defendant to the plaintiff."

Summons in the action was served on McClung, March 21, 1882, and on the 7th of November following he filed, in the Circuit Court of the United States for the Southern District of Ohio, his petition, under § 643 of the Revised Statutes, for a writ of *certiorari* to the State court, requiring that court to send to the Circuit Court the record and proceedings in the cause, on the ground that, "at the time the said acts charged in such petition are alleged to have been done, he was, and still is, an officer of the United States, appointed and acting under the authority of the revenue laws of the United States, . . . and all his acts in connection with the receipt and delivery of the merchandise described in said petition were done by him under color of his said office." Upon this petition a writ of *certiorari* was issued and the record and proceedings removed. Upon the entry of the cause in the Circuit Court the railroad company moved that it be remanded, "for the reason that this court has no jurisdiction of the person or subject-matter of the action." This motion was denied, November 15, 1882, and on the 12th of February, 1883, McClung answered the petition in the suit, denying that he had been notified of the lien, or that it had ever become his duty to re-

fuse to deliver the goods until the freight was paid, and also denying that he had ever received the freight for the benefit of the company.

Upon the trial it was shown that the freight and charges were paid to Wartman at the same time with the duties, and that, upon such payment, the goods were delivered to the consignees, without notice to the carriers. The plaintiff also offered further evidence " tending to prove that it had been the general usage and custom prevailing at the custom office of Cincinnati for ten years prior to the appointment of the defendant, and was the general usage and custom at the said office after the defendant's appointment, on March 18th, 1881; and down to the 8th of September, 1881, for the consignees of imported goods brought to the port of Cincinnati by all the common carriers who are authorized under said act to transport imported merchandise to the port of its destination, to pay the freights due to such common carrier at the office of the collector and of the cashier deputy of the surveyor of the port when a . . . notice in writing of the existence of a lien thereon in favor of the carrier had been given to the deputy collector at such office, and that such payments were exacted and required by the deputy collector as a precedent condition to the delivery of such goods by the surveyor of the port to the owners and consignees thereof, and that such freights were paid, together with the duties due upon such imported goods, to such deputy collector, sometimes in money, but most generally in checks, which included duties due to the government and the freights due for the carriage of said goods, and which checks were drawn by the consignees in favor of the surveyor of the port by name, or of the ' collector ' or ' surveyor ' of customs at the port of Cincinnati, which checks were indorsed and collected by such deputy collector for the collector or surveyor in his official capacity, and were collected in the usual course of business by such deputy collector ; and that, upon the receipt of such money or checks in payment of duties and freight, the goods were, by the order of said deputy, with the acquiescence of the surveyor of the port, delivered to the respective consignees ; and that the deputy collector, in

his official capacity, accounted with and paid over the freights so collected to the common carrier of such imported goods, from time to time, as the same were demanded."

There was also evidence tending to prove that the payments in this case were made in accordance with this custom and upon the demand of Wartman.

McClung was sworn as a witness in his own behalf, and testified that Wartman was acting as deputy when he came into office, and attending to the receipt of duties, and was continued in the same service by him; that he was never authorized to sign or indorse checks, and that he, McClung, was not aware that he had ever done so. He also testified that he had no knowledge whatever of the fact that Wartman was receiving freight moneys until September 6, 1881, which was after all these payments were made, and that there was not kept in the office any account of moneys received for freights.

At the close of the testimony the court charged the jury, among other things, as follows:

"In order to authorize a recovery against the defendant for failing to give the seasonable notice to the plaintiff required by the statute, before delivering the goods to the owners or consignees, an averment that the freights due plaintiff and for which it had a lien were owing and unpaid is necessary. There is no such averment in the plaintiff's petition in this case; on the contrary, it distinctly avers that the consignees did pay the freights to the defendant, and, while it does not say in express terms that it authorized such payments to be made, by demanding and suing for the same, as it has done, ratifies and confirms the payments, and claims that the money was received for its account and benefit, and demands judgment therefor. This is in fact the *gravamen* of its complaint, the theory upon which its suit rests, and the court instructs that you are here to try this case upon the hypothesis that the freights due from the consignees to the plaintiff for the carriage of the goods in question were paid before the goods were delivered by the defendant to the consignees, and that the defendant was therefore under no legal duty to give the plaintiff notice of his intention to make such delivery."

"It was competent for the parties, by express contract, or by a tacit understanding resulting from an established course of business, for the benefit and convenience of both parties, to agree that the defendant should receive the freights due the carrier for the account of the latter, and upon receipt thereof deliver the goods to the owners or consignees, and that such receipts by him should be in lieu of the notice which the law required him to give the carrier in the contingency described, by the statute. It may be that such tacit or implied agreement existed between these parties in this case. This is the question for you to determine. The defendant was under no official or legal obligation to undertake to thus act for the plaintiff. If he did so, he was but acting in his private capacity and not in the discharge of any official duty. It not being an official duty, his deputy could not thus act by reason of his official relations to his superior, and the defendant would not be liable for such extra official action unless he had in some way authorized his deputy so to act, or unless he has so acted as to estop him from denying that the deputy was in the specific matter complained of acting by his authority for him."

"If defendant had knowledge of this custom, acquired from observation from the business and books of his office, or through other sources, and acquiesced therein, and permitted the plaintiff to make its collections through his deputy in the belief that he was acting for and as his agent, or by his acts or declarations represented or held him out as his agent in the matter, the plaintiff and defendant, both understanding and tacitly or otherwise agreeing that the freights due the plaintiff should be paid in this way, in lieu of the notice which the statute in the contingency described required the defendant as collector to give to the plaintiff, he would be liable to the plaintiff for all sums so paid to the deputy for the plaintiff's use."

"If the deputy acted without authority from the defendant, and the defendant did not know of his said action, nor hold him out to the plaintiff as his agent, nor do nor say anything to mislead the plaintiff nor its officers nor agents, nor under-

take nor assume to collect plaintiff's freight, he would not be liable to plaintiff's demand, and your verdict ough to be in his favor."

To all this the railroad company excepted. There were other instructions to which exceptions were also taken, but they were all substantially embraced in the above, and it is unnecessary to repeat them here.

The jury returned a verdict for the defendant, upon which a judgment was entered, and the case is now here for review. The errors assigned were (1), that the court overruled the motion to remand; and (2), that it instructed the jury as above stated.

Mr. S. H. Holding for plaintiff in error (Mr. E. W. Kittredge was on the brief) cited: Dignan v. Shields, 51 Texas, 322; Badger v. Gutierez, 111 U. S. 734; Ogden v. Maxwell, 3 Blatchford, 319; McIntyre v. Trumbull, 7 Johns. 35; Mason v. Fearson, 9 How. 248; Clinton v. Strong, 9 Johns. 370; Martin v. Webb, 110 U. S. 7; Case v. Bank, 100 U. S. 446; King v. Bangs, 120 Mass. 514; Gooding v. Shear, 103 Mass. 360.

Mr. Benjamin Butterworth (Mr. Chaning Richards was with him on the brief) cited: United States v. Collier, 3 Blatchford, 349; Whitfield v. Le Despencer, Cowp. 754; Wiggins v. Hathaway, 6 Barb. 632; Conwell v. Voorhees, 13 Ohio, 523; S. C. 42 Am. Dec. 206; Brissac v. Lawrence, 2 Blatchford, 121; Tennessee v. Davis, 100 U. S. 257; Osborn v. Bank of the United States, 9 Wheat. 738.

Mr. Chief Justice Waite, after stating the case, delivered the opinion of the court.

The removal was under § 643 of the Revised Statutes, which provides, among other things, for the removal of "a civil suit . . . commenced in any court of a State against an officer appointed under or acting by authority of any revenue law of the United States, . . . on account of any act done under color of his office." This is a suit against a collector of cus-

toms, an officer appointed under the revenue laws of the United States, for an act alleged to have been done by him in the delivery of dutiable goods placed in his hands by virtue of his office subject to a carrier's lien. His liability, if any there is, grows out of his official duty to keep the goods and deliver them to the consignees thereof when the import duties are paid and the carrier's lien discharged. The allegation is, that the collector, instead of notifying the carrier, as the law required, delivered the goods to the consignees on receiving himself the moneys due for the carrier's charges. This suit is for the money so received. Clearly, then, according to the allegations of the petition, the suit is for an act done by the collector under color of his office. This is not seriously denied, but the claim is, that, as the defendant insists, and the court below has decided, that it was not the official duty of the collector to collect the carrier's money, and, therefore, that he is not liable for the acts of his deputy in that behalf, the suit is really one that could not be removed. But the petition alleges an act done by the collector under color of his office, and seeks a recovery on that account. Such a suit is removable, and certainly the right to a removal is not taken away because the collector says in his defence that the act charged was not in fact done. If done by him it was done under color of his office. The thing to be tried is whether it was done.

We agree entirely with the court below in the view it took of the character of the suit which has been brought. It is not for damages for delivering the goods without notice to the carrier, but for the charges collected on the delivery. That is the case made, both by the petition and upon the trial. The whole effort on the part of the company, so far as the record discloses, was to show that it was, and had been for years, the general usage in Cincinnati for consignees to pay the carrier's charges upon dutiable goods carried, and held in the custom house for the payment of duties, to the cashier deputy of the collector, and that such payments were exacted and required by the deputy as a condition precedent to the delivery, he accounting to the carriers for the money received on this account. The claim was that these payments had been made pursuant

to this custom, and that the collector was bound by the acts of the deputy, and liable for his defaults. If the suit had been to recover damages for the delivery without notice, this proof might perhaps have come from the other side to show that the carriers had, by long usage, made the deputy their agent to collect their charges, and that, as the payment had in this case been made to the deputy in accordance with that custom, no notice was required. We are clear, therefore, that the whole case turns upon the question whether the collector is liable for these collections of the deputy.

Section 2630 of the Revised Statutes gives authority to every collector of customs to employ, with the approval of the Secretary of the Treasury, "such number of persons as deputy collectors as he shall deem necessary, and such deputies are declared to be officers of the customs." There can be no doubt that the collector is answerable for all the acts of his deputies in the performance of their official duties under him. The real question here is, therefore, whether the collection of the carrier's charges was a part of the official duty of the collector. If it was, the collection by the deputy was an official act, and the principal officer is liable accordingly.

What, then, was the duty of the collector under this statute? Clearly, to take the goods from the carrier when brought, and not to deliver them to the consignees without first giving seasonable notice to the person or persons who had notified him in writing of the existence of a lien in their favor thereon for freight. The statute neither made it his duty to collect the freight nor authorized him to receive it for the lien-holder. Payment to him would not have been a payment o the carrier, so as to discharge the consignee from liability for the freight, unless the carrier had made him his personal agent for that purpose, in which case he would receive the money not as collector, but in his private capacity as the representative of the person to whom the money was due. The money in his hands on this account would not be in any sense public moneys, for which he was officially liable to the government, but private moneys, collected in a private capacity, for which he was accountable only to the person from whom he received his

authority. So, too, if he had received the freight without authority, and the carrier had sued him for it, he would be liable because the carrier, by suing, would have ratified his act and accepted his agency in the premises. But his liability in that case would not be official as collector, but private as the agent of the carrier.

It follows that the payment of the freight to the deputy was not in law, a payment to McClung, unless the deputy, in making the collection, was acting under authority from him, not in his official, but in his private capacity. For this purpose it is not sufficient that Wartman, to whom the payments were made, was the official deputy of McClung as collector. It must appear that he was his private agent in this behalf. That question was fairly submitted to the jury under proper instructions, and the verdict was against the company, and to the effect that McClung had not authorized Wartman to receive the freight moneys on his account. That concludes this point.

As the alleged exactions of the deputy were not within the scope, either actual or apparent, under the law, of the authority of the collector's office, the case is not within the principle which, under some circumstances, makes the officer liable for the illegal and wrongful acts of his deputy, of which *Ogden* v. *Maxwell*, 3 Blatchford, 319, and *McIntyre* v. *Trumbull*, 7 Johns. 35, cited in the brief of counsel for the company, are examples. And, besides, here the exactions, if any, were not from the company, but from the consignees, who alone can complain. If they were made without the authority of the company to whom the freight belonged, the company is under no obligation to accept the payment thus exacted in discharge of its debt for the freight, and may still proceed against the consignees for its recovery.

If this were a suit for delivering the goods without notice to the company, a different rule would apply. As it was the duty of the collector, as collector, to notify the company before delivery, and not to deliver until proof to his satisfaction had been produced that the freight had been paid or secured, it would have been a breach of official duty for the

deputy to make the delivery before the notice, and the act of the deputy would have been in law the act of his principal. Such a case would be within *Ogden* v. *Maxwell* and *McIntyre* v. *Trumbull*, and others of like import, which are very numerous. But, as has already been shown, this suit is not of that character. It is for the money paid, and not for delivery without payment.

It follows that there is no error in the record, and the judgment is consequently

*Affirmed.*